Alfred McKENZIE, et al., Plaintiffs,

v.

Ralph KENNICKELL, Jr., Defendant.

Civ. A. No. 73–0974.

United States District Court,
District of Columbia.

April 18, 1988.

Roger E. Warin, Sharon L. Davis, Steptoe and Johnson, Washington, D.C., for plaintiffs.

Jeffrey Hunter Moon, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

After prevailing on the merits in this class action litigation brought by black employees at the Government Printing Office ("GPO"), their counsel now seek an enhancement to the lodestar award of attor-

neys fees and costs. Following months of negotiation and subsequent delays in processing the proposed settlement through the bureaucracy, a final stipulation was agreed upon and later approved by the Court on April 8, 1988. The parties agreed to a lodestar fee of $740,000 that covered the total fee claims of counsel for individual plaintiffs and counsel handling all fee claims, and the lodestar claims of class counsel.[1]

Counsel for the class action plaintiffs contend, however, that the lodestar, alone, does not provide "reasonable" compensation for their efforts in this litigation because it fails to reflect both the risk of nonpayment and the quality of their representation. They contend that "reasonable" compensation should include a premium for these factors, and thus, they urge the Court to award them a fifty percent enhancement for the former and a twenty-five percent multiplier for the latter.[2]

This litigation was commenced in 1973, only one year after Congress had amended Title VII and extended relief to employees of the federal government. 42 U.S.C. § 2000e–16(d). During the early stages of the proceeding, plaintiffs' counsel ventured upon unchartered legal terrain and recently opened avenues of relief relating to racial discrimination in federal employment.

With unusual skill and tenacity, plaintiffs' counsel helped shape the legal parameters of Title VII class action litigation. At the same time, they achieved for their clients and others, long-denied and long-overdue financial and equitable relief for black employees at the GPO. Plaintiffs' present motion seeking an enhancement to the lodestar fee award constitutes the final chapter in this protracted and hotly contested law suit.[3]

There is no dispute that plaintiffs' counsel deserve a reasonable fee award for their successful endeavors. The central question is what constitutes a reasonable fee. Specifically, the question now presented is whether the lodestar award, alone, affords adequate compensation to counsel for their services or should it be enhanced by a premium for risk of nonpayment and the quality of representation?

During the last term, our Supreme Court in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, — U.S. —, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) ("Delaware Valley II") provided standards to be followed by federal courts in awarding contingency enhancements.[4] Plaintiffs' counsel's present request for an enhancement covering the risk of nonpayment, is among the first calling for an interpretation and application of *Delaware Valley II*.[5] Fur-

1. Individual counsel includes attorneys who represented individual class members for purposes of "Teamsters" relief hearings under the ruling in *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Class counsel are those attorneys who pursued the litigation since its inception. The Steptoe and Johnson law firm is litigating the fee issues.

2. The April 8, 1988 stipulation provides in paragraph No. 8 that any enhancement should be applied to a lodestar figure of $690,000. Therefore, they seek $345,000 for contingency and $172,500 for quality of representation.

3. The Court has entered numerous opinions addressing both substantive matters as well as the proprietary of attorneys fees. These opinions offer a thorough account of the issues involved in the underlying action. For a fuller description *see McKenzie v. McCormick*, 425 F.Supp. 137 (D.D.C.1977); *McKenzie v. Saylor*, 508 F.Supp. 641 (D.D.C.1981); *McKenzie v. Sawyer*, 684 F.2d 62 (D.C.Cir.1982); *McKenzie v. Kennic-*

*kell*, 645 F.Supp. 427 (D.D.C.1986); *McKenzie v. Kennickell*, 669 F.Supp. 529 (1987).

4. In *Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 431 (1986) ("Delaware Valley I") the Court held that attorneys' fees were available for time spent on administrative proceedings. It expressly reserved the propriety of enhancement for contingency for the following term.

5. Only recently Judge John L. Smith of this District ruled that Delaware Valley II supported plaintiffs' request for an enhancement for risk of nonpayment. *Palmer v. Schultz*, 679 F.Supp. 68 (1988). Plaintiffs' counsel were awarded their requested 50 percent multiplier.

Trial courts in other circuits have analyzed and applied the *Delaware Valley II* standard. *See In re Wicat Securities Litigation*, 671 F.Supp. 726, 740 (D. Utah 1987) (denying an enhancement for contingency); *Clark v. Marengo County Commission*, 667 F.Supp. 786, 798–799 (S.D.

thermore, their request for an enhancement because of the quality of representation comes in the wake of a recent ruling from this Circuit explicating the standards for such awards. *Thompson v. Kennickell,* 836 F.2d 616 (D.C.Cir.1988).

■ After carefully considering the points and authorities and other submissions of counsel in this proceeding, and with benefit of *Delaware Valley II* and subsequent decisions interpreting that ruling, this Court determines that plaintiffs have satisfied their evidentiary burdens. And for the reasons set forth below, plaintiffs' counsel are awarded an enhancement to the lodestar award covering both the risk of nonpayment and the quality of representation.

## I. ENHANCEMENT FOR THE RISK OF NONPAYMENT

### A. *Legal Standard for Enhancement*

*Delaware Valley II* establishes the controlling standard for awarding enhancements based on the contingency factor.[6] In a plurality opinion, the Supreme Court concluded that risk multipliers are permissible under certain conditions and set forth two criteria necessary for awarding an enhancement. Justice O'Connor together with four dissenting justices, (Justices Blackmun, Brennan, Marshall and Stevens)

agreed that "compensation for contingency must be based on the difference in market treatment of contingent fee cases *as a class,* rather than on an assessment of the 'riskiness' of any particular case." *Delaware Valley II,* 107 S.Ct. at 3089 (O'Connor, J., concurring) (emphasis in original). A different majority (Chief Justice Rehnquist and Justices, White, Powell, Scalia and O'Connor) held that "no enhancement for risk is appropriate unless the applicant can establish that without an adjustment for risk the prevailing party 'would have faced substantial difficulties in finding counsel in the local or other relevant market.'" *Id.* at 3091 (O'Connor, J. concurring, quoting Justice White).[7]

Our Circuit, in *Kennickell,* recently adopted Justice O'Connor's analysis and remanded for a determination whether "absent a contingency incentive, the prevailing party would have faced 'substantial difficulty in finding counsel.'" *Thompson v. Kennickell,* 836 F.2d at 621.[8]

The parties agree that Justice O'Connor's analysis provides the framework for analyzing the propriety of awarding enhancements for contingency and they also agree on the general guidelines established by the justices. They concede that plaintiffs bear the burden of proving (1) that the relevant legal market treats contingency cases differently from non-contingency,

Ala.1987) (granting a contingency enhancement of fifteen percent).

**6.** Although *Delaware Valley II* concerned a fee award under § 304(d) of the Clean Air Act, 42 U.S.C. 7604(d), the Court relied on "the principles and case law governing the award of such fees under the [Civil Rights Attorneys' Fees Awards Act of 1976] 42 U.S.C. § 1988. 107 S.Ct. at 3080 n. 1.

**7.** Originally, enhancements were reserved for those "rare and exceptional cases" in which the lodestar did not adequately compensate the prevailing party. *Blum v. Stenson,* 465 U.S. 886, 899, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984). Over the last few years the Supreme Court has consistently narrowed the grounds for awarding any additions to the lodestar. However, the standard announced in *Delaware Valley II* reverses this trend.

Justice O'Connor expressly directed that "District Courts and Courts of Appeals should treat a determination of how a particular market compensates for contingency as controlling future

cases involving the same market." *Delaware Valley II,* 107 S.Ct. at 3090. Therefore once a trial court determines that the relevant market provides a premium to contingency cases as a class, such enhancements would become a routine integral part of all fee awards.

**8.** In an earlier opinion, our Circuit concluded that Justice O'Connor's concurring opinion "provides the narrowest rationale" and hence must be treated as the holding in the case. *Save Our Cumberland Mountains, Inc. v. Hodel,* 826 F.2d 43, 53, n. 6 (D.C.Cir.1987) (reh'g en banc granted 830 F.2d 1182 (1987)).

Justice O'Connor served as the swing vote in *Delaware Valley II* between Justice White, Chief Justice Rehnquist, Justices Powell and Scalia who concluded that risk multipliers are never permissible and Justices Blackmun, Brennan, Marshall and Stevens who held that a risk multiplier is permissible when based on the premium for contingency existing in the prevailing market. She joined with the plurality to reverse the district court's award of a multiplier in that

and (2) that absent an enhancement, the plaintiffs would have faced substantial difficulty in securing counsel. But at that point, their agreement stops. Counsel for the parties present significant issues concerning the application of the various elements of the Court's plurality decision. Specifically, they disagree over the definition of the relevant class, the appropriate temporal focus for assessing the market treatment for contingency, the type of proof necessary for showing that absent a contingency, "the prevailing party would have faced substantial difficulty in finding counsel." *Delaware Valley II,* 107 S.Ct. at 3091, and whether different standards should exist for awarding enhancements to nonprofit as over against private law firms. The Court will address each of these disputes below.

### 1. Definition of the Relevant Class

Justice O'Connor directed that compensation for contingency "must be based on the difference in market treatment of contingent fee cases as a class." *Id.* at 3089. However, she neglected to define the explicit parameters of the relevant class. Plaintiffs urge that the relevant class should be all contingency cases, particularly other types of complex Federal litigation. They argue that "Congress intended Title VII attorney's fee awards to mirror those awarded in other cases. Consequently ... statements by affiants practicing outside Title VII regarding their expectation of contingency enhancements are relevant to plaintiff's motion."[9] The government, on the other hand, argues that the relevant comparable class should be restricted to other Title VII cases.[10] It claims that the purpose for awarding enhancements is to insure that competent counsel will accept Title VII suits. Because it assumes that the attorneys who litigate Title VII cases do not compete with those who litigate other types of contingen-

cy cases, such as tort actions, the government concludes that the standard for payment of a premium in non-statutory fee cases is completely irrelevant. The Third Circuit examined the definition of the relevant class and adopted the broad all-embracing definition urged by plaintiffs. *Blum v. Witco Chemical Corporation,* 829 F.2d 367 (3rd Cir.1987). A unanimous court concluded "[I]t does not appear that Justice O'Connor ... contemplated that the class of cases to be studied be anything less than all contingency cases in a given geographic market, including personal injury cases." *Id.* at 381. The Third Circuit's analysis is consistent with the thrust of Justice O'Connor's opinion. Indeed, throughout her concurrence, Justice O'Connor constantly referred to the "class" of contingency cases but never included any language suggesting that the class should be restricted to actions where statutory fees are available.

### a. Treatment of contingency cases in the District of Columbia market

In any event, even if this Court were to limit the relevant class to Title VII cases, plaintiffs have submitted persuasive, and for the large part unchallenged, affidavits demonstrating that the District of Columbia legal market requires a premium for all contingency cases including Title VII. Their counsel proffered 21 affidavits from attorneys practicing in this jurisdiction. The attorneys were from a variety of firms, both large and small, and included private and public interest firms. Sixteen of the 21 attorneys submitting affidavits had significant experience in Title VII cases and asserted that a premium would be necessary to induce them to accept such cases. Plaintiffs also submitted four supplemental memoranda containing numerous affidavits from a wholly different set of attorneys practicing in the local metropolitan area.[11] These attorneys uniformly as-

---

case but refused to hold that risk multipliers are always impermissible.

**9.** Plaintiff's Reply to Defendant's Memorandum in Opposition to Plaintiff's Motion for Enhancements to the Lodestar for Contingency and Results Obtained at 13 (filed Jan. 5, 1988).

**10.** Defendant's Memorandum in Opposition to Plaintiff's Motion for Enhancement to the Lodestar for Contingency and Results Obtained at 18 (filed Dec. 15, 1987).

**11.** These affidavits were prepared and filed in an action currently pending before Judge Louis

serted that a premium was necessary before they accepted cases on contingency.

The government offered not one shred of evidence to rebut plaintiffs' thorough documentation. Instead, it attempted to undermine the relevancy of plaintiffs' evidence by arguing that the affidavits were hypothetical and prospective in nature. However, an examination of the declarations demonstrates that the government's description falls short and is incorrect. The affiants all declared that their individual or firm's *current* practice was to refuse cases on a contingent fee basis if no premium was available. For instance, Ms. Nora Bailey, a partner in Ivins, Phillips & Barker who acted as co-counsel in *Thompson v. Kennickell,* a Title VII class action suit alleging sex discrimination in the Government Printing Office, stated that her firm will accept cases on a contingent fee basis if the client agrees to pay a fee on a multiple of two or three of the hourly rates.[12] Similarly Mr. David Dorsen, a partner in Sachs, Greenebaum & Tayler, co-counsel in *Kennickell* declared that his firm accepts "only those contingent cases in which the fee exceeds 100 percent of the fee that would be paid by a client which pays monthly on the basis of the firm's normal hourly rate." [13] Mr. Joel P. Bennett, a highly regarded sole practitioner whose practice is primarily devoted to employment litigation and who has extensive experience with Title VII claims, declared that he would only accept a Title VII case if he were assured "a contingency enhancement of 100% above my hourly rate." [14] These affidavits are representative of all 21 submitted by plaintiffs as well as the supplemental affidavits prepared in connection with the *King* litigation before Judge Oberdorfer. Together, the several declarations clearly demonstrate that attorneys in the relevant legal market, the District of Columbia metropolitan area, require an enhancement to their normal billing rates for any action accepted on a contingent basis.

■ Finally, Justice O'Connor instructed district courts to "treat a determination of how a particular market compensates for contingency as controlling future cases." *Delaware Valley II,* 107 S.Ct. at 3090. Just weeks ago, a colleague Judge John L. Smith ruled in *Palmer v. Schultz* that "attorneys in the Washington, D.C. community will not ordinarily take cases on a contingent basis without an upward adjustment of their normal hourly rate of at least 100 percent," 679 F.Supp. 68, 74 (1988).[15] In accordance with Justice O'Connor's direction, this Court follows and adopts Judge Smith's decision.

### 2. Relevant Time Frame for Measuring Community Practice

■ The parties disagree as to the appropriate dates for measuring market treatment of contingency cases. The government urges that the relevant time frame is the date that the litigation was commenced; plaintiffs contend that the relevant temporal focus is the current one, prevailing at the time an award is made.

Although Justice O'Connor did not explicitly discuss the appropriate time frame for analyzing market treatment, her very silence supports plaintiffs' position. If she had desired fee petitioners to produce evidence as to how the market compensated for risk at the time the case was instituted, she would have expressly required such a

---

Oberdorfer. *See King v. Palmer,* C.A. No. 83–1980, D.D.C. Plaintiffs' counsel in that action are also seeking an enhancement for contingency.

**12.** Plaintiffs' Motion for Enhancements to the Lodestar Fee, Exhibit A ¶ 3.

All Exhibits marked by a capital letter were attached to Plaintiffs' Motion for Enhancements to the Lodestar Fee.

**13.** Exhibit F ¶ 3.

**14.** Exhibit B ¶ 5.

**15.** In *Palmer* counsel received a reduced hourly fee irrespective of the outcome of the litigation. Because counsel in *Palmer* represented their clients on a quasi-contingent basis, the arguments for an enhancement for nonpayment were far less compelling than those presented here. Plaintiffs acknowledged that their risk of nonpayment "was substantially mitigated by Ms. Palmer's obligation to pay them half their customary fee." At 73. Here, counsel have not entered into any formal or informal retainer agreements. Their payment rests solely on the outcome of the proceedings.

showing. Indeed, while the *Delaware Valley* litigation, itself was instituted in 1977, she did not direct plaintiffs to determine how the market compensated for contingency at that earlier date.[16] Indeed, her opinion together with that of the dissent, both consistently referred to current market treatment. Justice O'Connor instructed the trial courts to make "findings of fact concerning the degree to which contingency *is* compensated in the relevant market." *Delaware Valley II*, 107 S.Ct. at 3091 (emphasis added). Similarly, Justice Blackman advised the trial courts to "arrive at an enhancement for risk that parallels as closely as possible, the premium for contingency that exists in *prevailing* market rates." *Id.* at 3102.

Use of current market treatment comports more closely with the thrust of Justice O'Connor's opinion. She adopted the market model to achieve a consistent, objective process for awarding fees. She also explicitly counseled courts to "strive for consistency from one fee determination to the next." *Id.* at 3090. Reliance on current market treatment of contingency cases best promotes these goals. It is significantly more difficult to recreate market practices existing some fifteen years ago—and such a requirement would give rise to greater potential for error. Furthermore, it would reduce the evidentiary burdens placed on trial courts and minimize the possibility that each request for an enhancement would lead to "a second major litigation." *See Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed. 2d 40 (1983).[17]

Notwithstanding the difficulty in reaching back in time to determine the market's treatment of contingency cases in 1972, fee petitioners have demonstrated that the legal market required compensation for contingency during the 1970s. Several of the affiants discussed their firm's policies in the 1970's and stated that a premium for risk of nonpayment was routinely required. *See* Declaration of Chester T. Kamin Exhibit J ¶ 3; Declaration of Bradley G. McDonald Exhibit K ¶ 4. Declaration of Roderic Boggs, Exhibit C ¶ 4.

Again, in the face of plaintiffs' compelling factual documentation from reliable sources, no rebuttal evidence was forthcoming from the government. Plaintiffs' representations that the legal market in the District of Columbia currently requires and historically required an enhancement for contingency warrants favorable consideration by this Court.

### 3. Proof That Plaintiffs Would Have Had Difficulty Finding Counsel Without an Enhancement

Justice O'Connor's second criteria for awarding an enhancement requires that the fee applicants prove that without an "adjustment for risk the prevailing party would have faced substantial difficulty in finding counsel in the local market." *Delaware Valley II*, 107 S.Ct. at 3091. To satisfy this burden, the government contends that plaintiffs' counsel must prove that their clients had genuine difficulties finding counsel, and that, but for the expectation of enhancement, they would not have accepted the case. According to the government, the record is devoid of any evidence of such difficulty. Further, it contends that plaintiffs' counsel had no expectation of receiving an enhancement in 1972 when they accepted the suit.

#### a.

The government's interpretation of Justice O'Connor's second prong controverts the very purpose behind her newly enunciated standard. It is impossible to demonstrate that plaintiffs actually had difficulty finding counsel without embroiling the

---

**16.** Similarly, *Thompson v. Kennickell* was filed 14 years ago. However, in its remand, our Circuit Court did not instruct the plaintiffs to establish the market's treatment of contingency in 1974.

**17.** Justice O'Connor directed that a trial court's determination of how a particular market compensates for contingency should control future cases. *Delaware Valley II*, 107 S.Ct. at 3090. If all courts were using the same time frame—current market practice—only one court would be required to develop a thorough evidentiary record.

courts in an analysis of the riskiness of the particular case.[18] Yet *Delaware Valley II* resoundingly rejected such an inquiry. Indeed, Justice O'Connor explicitly instructed that "a court should not award any enhancement based on 'legal' risks or risks peculiar to the case." *Id.* at 3091. An inquiry into the riskiness of a particular case would result in arbitrary and inequitable compensation and undermine the very goal of a market-based standard—to create an "objective and nonarbitrary" process. *Id.* at 3090.[19]

Justice O'Connor's second criteria is more reasonably interpreted as an elaboration of her first. Once plaintiffs demonstrate that the market provides a premium for contingency cases as a class, they need only show there exists a general dearth of counsel willing to accept such suits in the absence of an enhancement.[20]

█ Plaintiffs have made this showing. They have submitted substantial and credible evidence demonstrating that the shortage of counsel willing to accept employment discrimination cases on a contingency basis is a fact and not a mere speculative exercise. Indeed, affidavits from nine individuals showed that they were unable to secure counsel to represent them in their Title VII action. Each of the nine ultimately proceeded *pro se.*[21] In addition, Ms. Ann

Barker, Supervisor of the District of Columbia Bar Referral and Information Service, declared in her affidavit of December 8, 1987 at page 2 that "employment discrimination cases are among the most difficult to place." Mr. Joseph Sellers, Director of the Equal Opportunity Employment Program of the Lawyer's Committee attested in his deposition of November 9, 1987, page 35, that he had been unable to secure counsel for over twenty-five percent of requests in employment discrimination cases.

Furthermore, plaintiffs have established that federal employees pursuing Title VII class actions face even greater difficulty securing counsel. Several declarations were included from local counsel who are willing to accept individual Title VII cases but who refuse to litigate class actions on the grounds that recouping fees from the federal government takes longer and is more difficult.[22] Indeed, plaintiffs' own experience in *McKenzie*, a litigation which spanned fourteen years, illustrates the problems and difficulties encountered in obtaining deserved fees from the federal government.[23]

*b.*

Plaintiffs' counsel have also furnished extensive evidence that they accepted this

---

**18.** Clearly a plaintiff who had a meritorious case would have little difficulty finding counsel. It is axiomatic that those with more speculative claims would find it more difficult to secure counsel.

**19.** Indeed, rejection of an inquiry into the risks of a particular case was the only issue that all nine justices could agree upon. The plurality rejected awarding fees based on the riskiness of the particular case reasoning that such a standard created a potential conflict between attorney and client; imposed an impossible task on judges to ignore the reality of hindsight when evaluating the risk; and, penalized those defendants with the strongest claims. *Id.* at 3084. The four dissenters also refused to look at "the degree of risk presented by a particular case.... Rather a court's job simply will be to determine whether a case was taken on a contingent basis, whether the attorney was able to mitigate the risk of nonpayment in any way, and whether other economic risks were aggravated by the contingency of payment." *Id.* at 3097.

**20.** Further, the government's proposed standard would create an evidentiary nightmare. It would require plaintiffs to keep a scorecard of all their contacts with potential counsel. The Supreme Court could not have intended to burden plaintiffs who are primarily concerned with redressing their grievances with such a task. Moreover, such a requirement would foreclose all counsel who commenced suits prior to the issuance of *Delaware Valley II* from obtaining an enhancement. Again, the Court could not have intentionally set up such a dichotomy.

**21.** Plaintiffs Reply Brief Exhibit D.

**22.** Declaration of Lawrence Speiser, Exhibit O ¶ 3 (Aug. 21, 1987); Declaration of Bruce J. Terris, Exhibit P ¶ 8 (Aug. 19, 1987). Deposition of Jane L. Mcgrew (Dec. 11, 1987) at 29.

**23.** Even after this Court ordered the government to pay counsel an interim fee for work completed through 1981, it was more than six months before payment was made. *See McKenzie v. Kennickell,* 669 F.Supp. 529, 532.

Title VII class action with the expectation of receiving a reasonable statutory fee. Class counsel's affidavits point out that the availability of reasonable fees was an important factor in their decision to proceed with the case. They candidly conceded that they did not explicitly consider the possibility of an enhancement as a distinct component of a reasonable fee but only because the terminology and methodology of the lodestar, and multiplier were not even conceived until 1973—after this suit was commenced.[24]

#### 4. Enhancements for Nonprofit Law Firms

■ The government strongly argues that contingency enhancements should never be awarded to nonprofit firms. It reasons that because such firms only represent clients who are unable to pay, they would respond to the call for representation irrespective of the availability of an enhancement. Therefore, it claims that such enhancements are not necessary to attract nonprofit firms.

The government's proposition contravenes clear Supreme Court precedent and the authority in this Circuit. In *Blum v. Stenson*, 465 U.S. 886, 894, 104 S.Ct. 1541, 1546, 79 L.Ed.2d 891 (1984), the Court held that nonprofit firms should be remunerated under the same standards as other firms. After reviewing the legislative history of fee shifting statutes, the Court concluded "that Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization." *Id.* Although the plurality in *Delaware Valley II* expressly left open the question whether a contingency multiplier should be awarded to nonprofit firms, the majority of the Court approved the availability of such an enhancement to those firms.[25] Justice O'Connor did not discuss the issue directly. However, her focus on establishing consistent and objective standards for awarding enhancements strongly supports treating the two types of counsel the same.[26]

Justice Blackmun spoke directly to the issue: "nonprofit legal-aid organizations should receive no less in fee awards than ... the private market." *Id.* at 3096. Any other rule would establish an unwarranted dichotomy between private and nonprofit counsel and would "inevitably ... obstruct the vindication of federal rights." *Id.*

Our Court of Appeals has vigorously opposed drawing any distinction in awarding fees between nonprofit firms and private attorneys. Indeed, our Circuit's statement in *Copeland v. Marshall*, 641 F.2d 880, 899 (D.C.Cir.1980) (en banc) is worthy of repetition:

the purpose of Title VII's fee award provision, ... is to encourage the private enforcement of the civil rights laws. While some lawyers would assist in the private enforcement of Title VII for a reduced fee, Congress has recognized that payment of a full fee will provide greater enforcement incentives. Full fee awards to public interest firms help fi-

---

**24.** The lodestar methodology was first announced by the Third Circuit in *Lindy Bros. Builders Inc. v. American Radiator & Std. Sanitary Corp.*, 487 F.2d 161, 167 (3rd Cir.1973). Our Court of Appeals adopted the lodestar methodology in *Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir.1980). It was not expressly adopted by the Supreme Court until 1983 in *Hensley v. Eckherhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40.

**25.** The issue of whether a contingency multiplier should be awarded to nonprofit law firms was raised by an amicus party. Although the plurality discussed the issue and expressed reservations of such awards, it explicitly refused to "pass" on this submission. *Delaware Valley II,* 107 S.Ct. at 3088 n. 10. Further, the Amicus'

reliance upon and the plurality's citation to a Second Circuit case, *New York Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136 (2nd Cir.1983) for support against awarding enhancements to nonprofit firms is not compelling. That case was decided before *Blum* and rested on the premise that nonprofit firms should not be compensated under the same standards as private firms. This principle was thoroughly rejected in *Blum.*

**26.** Moreover, in *Delaware Valley II* counsel for plaintiff was a nonprofit firm. Despite this fact, Justice O'Connor failed to distinguish between private and nonprofit firms. Her very silence supports the view that nonprofit and private firms should be compensated according to identical standards.

nance their work, both in the instant case and in others. Indeed, fee awards, ... may help reduce the subsidies ... that some of these organizations receive.[27] *Cf. Student Public Interest Research Group v. AT & T Bell Laboratories,* 842 F.2d 1436 (3rd Cir.1988).

Finally, plaintiffs have demonstrated that the risk of nonpayment discourages their organizations from accepting complex, Title VII class-actions, such as *McKenzie.*[28] Therefore awarding enhancements to nonprofit firms is "necessary to bring the fee within the range that would attract competent counsel." *Delaware Valley II,* 107 S.Ct. at 3091.

Congress enacted fee shifting statutes to ensure that "private citizens ... have a meaningful opportunity to vindicate the important Congressional policies which these laws contain." S.Rep. No 94–1011 p. 2 (1976). The statutes were designed to attract competent counsel without producing a windfall to attorneys. *Id.* at 6. To properly strike this balance, Congress instructed that "the amount of fees awarded ... be governed by the same standards which prevailed in other types of equally complex Federal litigation." *Id.* Plaintiffs' counsel have produced a substantial array of evidence demonstrating that the private market demands a premium of 100 to 200 percent for accepting contingency cases. Therefore, plaintiffs' counsel requested enhancement of 50 percent barely elevates their fee up to the "reasonable" level contemplated by Congress.

## II. ENHANCEMENT FOR QUALITY OF REPRESENTATION

Plaintiffs' counsel have petitioned for a twenty-five percent enhancement as com-

pensation for the quality of representation and exceptional results.[29] Only recently the Supreme Court reaffirmed its position that "in rare and exceptional cases adjustment to the lodestar is permissible to incorporate factors not reflected in the lodestar." *Pennsylvania v. Delaware Valley Citizens Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986) ("Delaware Valley I"); *see also Blum* 465 U.S. at 897, 104 S.Ct. at 1548 (citing *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983)). The Supreme Court has identified quality of representation as a factor that "may justify an upward adjustment.... where the fee applicant offers specific evidence to show that the quality of service rendered was superior." *Blum,* 465 U.S. at 899, 104 S.Ct. at 1549. Concurrent with the heavy burden on fee petitioners to justify an upward adjustment, courts have the duty to elucidate with particularity the reasons why the lodestar figure was not a "reasonable" compensatory fee.

If the Supreme Court's caveat authorizing enhancements in rare and exceptional circumstances is to be more than a theoretical possibility, then this proceeding is one of such cases, deserving of an enhancement. Over the course of the last fifteen years, plaintiffs counsel have achieved remarkable injunctive and monetary relief for their clients. Because of this litigation a major government employer of blacks in the public sector in the District of Columbia was directed to undertake radical changes in its hiring and promotional practices. Indeed, it called for a complete re-

---

**27.** This passage demonstrates the irrelevancy of the government's argument that counsel employed at nonprofit firms do not deserve an enhancement because they are salaried employees who face no consequences from the risk of nonpayment. Furthermore, the government's distinction is fallacious. Attorneys employed at nonprofit firms are treated no differently than associates at private law firms; neither jeopardize their salary check by working on contingency cases.

**28.** The Executive Director of the Lawyers Committee declared in his affidavit that "lack of a

contingency enhancement would discourage ... [the firms] from investing substantial staff time into large class actions." Affidavit of Roderic Boggs ¶ 8. Indeed, statutory fees constitute a large part of the Lawyers' Committee's operating budget.

**29.** Our Court of Appeals has instructed courts to treat "results obtained as an integral element of "quality of representation" rather than as a distinct factor." *Thompson v. Kennickell,* 836 F.2d at 622.

versal of blatant and racially discriminatory employment practices which had prevailed for years.

Because of this lawsuit, the GPO was required to develop and implement new, nondiscriminatory personnel procedures for the evaluation and selection of uprates and supervisors. The system was designed to remedy past discrimination and prevent discrimination in the future. The GPO was also required to alter its testing procedures and adopt a seniority-based system for the selection of persons to enter training programs to remedy the exclusion of black employees from such training programs in the past. In 1973, when the complaint was filed, there were no black supervisors in the Offset Print Section of the GPO. By August, 1986 the pattern of employment in supervisory positions by blacks had been reversed. Deposition of Douglas Parker (November 11, 1987) at 47–48. The various promotions and advancement opportunities were accompanied by substantial monetary benefits and resultant pay increases to the plaintiff class.[30] In addition plaintiffs' counsel also negotiated a $2.4 million settlement covering back pay.

This Court recognizes that our Court of Appeals has instructed that remarkable success, alone, is insufficient to warrant an enhancement. *Thompson v. Kennickell*, 836 F.2d at 622–623.[31] However, the degree of success cannot be ignored. Indeed, a review of the exceptional results is integral to an analysis of the quality of representation.[32]

■ To warrant an enhancement for quality of representation plaintiffs must provide the court with "specific evidence" demonstrating that the exceptional results were a consequence of the superior quality of their services.[33] To meet this standard, counsel for the plaintiffs evaluated the quality of their services and attempted to identify those efforts which were of exceptional quality. Mr. Douglas Parker, lead counsel for the plaintiffs since the inception of this action stated:

> that the negotiations with the government, at every step of the process .. took exceptional skill,.... Because I had been involved in the case since the very first day ... I and I alone had the knowledge of all of the ins and outs of the individuals involved.... In structuring the relief that we came up with in 1981.... that was the result of having been involved in the case from the outset.

Deposition of Douglas Parker (Nov. 11, 1987) at 40–41.

He further contended that the lodestar in no way reflected the "level of commitment and sort of intellectual engagement involved in the case." Continuing on he stated that "there were certainly hours spent in negotiations with the Government Print-

---

**30.** Douglas Parker, lead counsel for the plaintiffs since the inception of this lawsuit, calculated the total monetary value of the various promotions between 1973 and 1986 to be $2.8 million. The methodology used to arrive at this total is set forth in Exhibit R of Plaintiffs' Motion for Enhancements to the Lodestar Fee.

**31.** The *Kennickell* court set forth the circumstances under which a district court may award an enhancement for quality of representation. An enhancement award for "exceptional results obtained" was reversed on the grounds that plaintiffs failed to produce "specific evidence to rebut the presumption that the lodestar figure was reasonable." *Id.* at 622. The court refused to award an enhancement based exclusively on the plaintiffs' exceptional victory, stating that the trial court failed to "justify with particularity ... why compensation for hours worked would not fully compensate the attorneys." *Id.* at 623.

**32.** Indeed, how could one measure quality of representation if not by the exceptional results obtained? If the court neglected to evaluate the exceptional results obtained it would be forced to rely on its own subjective standard of attorney excellence to measure the quality of representation. Such an analysis would undermine the goal of establishing a more objective methodology for awarding enhancements.

**33.** Plaintiffs also predicate their request for an enhancement on the fact that they "were charting new and uncertain ground against a tenacious and powerful opponent which fought them with every weapon at its disposal." However, enhancements are not available for the novelty of the issues or the tenacity of the government's position. *Delaware Valley II*, 107 S.Ct. at 3091 ("New and novel issues ... and the stubbornness of the defendants, ... should already be reflected in the lodestar").

ing Office, working out the details implementation, phone calls with the general counsel over there, meetings with my clients that are not reflected on the time sheet." Deposition at 42, 43.

In a similar manner, Mr. Elliot Mincberg, a member of the Hogan & Hartson law firm who, since 1977 has been intimately involved in this action added:

> in this particular case, I think that there has been kind of an unique combination of efforts from Hogan & Hartson, from the Institute for Public Representation, and Doug Parker, in particular, who has been with this case from the beginning, which is an important factor in quality....
>
> When taken in combination ... that combination of services that's been provided, in my experience, is of exceptional high quality because it's brought to this case continuity, experience, in addition to native legal skill, ... I cannot think of a case in which it's been surpassed.

Deposition of Elliot Mincberg, (November 11, 1987) at 71.

Although these comments could be dismissed as self-serving, they were provided in direct response to questions by the government. Plaintiffs counsel were merely attempting to satisfy the standards set forth in *Blum* and amplified in *Thompson* requiring that counsel evaluate their efforts and identify with specificity why their services were of superior quality.

Plaintiffs' counsel provided an accurate, yet modest evaluation of their efforts. Beyond all of the above, this Court presided over and has been intimately involved with this litigation for the last fifteen years. And it states without hesitation, that counsel's efforts were well above the quality of attorneys appearing before this Court in similar and comparable litigation. Indeed, by their performances they have reflected the best spirit of the public interest bar.

The tentative lodestar settlement fee did not incorporate a premium for the superiority of counsel's efforts. The majority of the work during the early stages of this proceeding were performed by Messrs. Parker and Dale Swartz when they were junior associates. The two performed at levels well beyond the standards expected of attorneys with such limited experience. Their lodestar hourly fee of $40 simply did not reflect and indeed their pay level was below the quality of their performances.[34] Furthermore, both attorneys have remained actively involved in this litigation for fifteen years. Mr. Parker has acted as lead counsel throughout. It is extremely rare that the same attorneys remain at the helm in such a protracted litigation. Indeed, over eight Assistant United States Attorneys have assumed the responsibilities for defending this suit. Such continuity promotes tremendous efficiency and necessarily reduces the ultimate expenditure of hours. Therefore, the lodestar fee could not possibly reflect the benefits derived from Parker's extensive experience and intimate knowledge with this litigation.[35]

## CONCLUSION

Our Supreme Court has stated time and time again that counsel who prevail in Title VII litigations deserve a "reasonable" fee for their efforts. *Blum*, 461 U.S. at 895, 104 S.Ct. at 1547. Plaintiffs' counsel have presented an abundance of reliable, unchallenged, convincing, and well-documented material demonstrating that a reasonable fee requires an enhancement of the lodestar. They have clearly shown that Title VII plaintiffs routinely face significant

---

**34.** Our Court of Appeals has interpreted the Supreme Court's decision in Library of *Congress v. Shaw*, 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) as barring awards based on current rates and requiring courts to award fees based on the historical billing rates "contemporaneous with the work done." *Save our Cumberland Mountains*, slip op. at 12. Following the *Shaw* decision, this Court relied on historical rates when awarding fees for work performed up through 1981. *McKenzie v. Kennickell*, 645 F.Supp. at 443. In that decision, the Court set Parker's hourly fee at $40 in 1973, $45 in 1974 and $60 in 1975.

**35.** Indeed, by limiting remuneration to the lodestar, Parker would be penalized financially for his commitment and diligence. Certainly, the Supreme Court never envisioned that the lodestar methodology should discourage such admirable commitment.

problems securing counsel to represent them on a contingent fee basis. Such difficulties will become even more acute if enhancements are no longer available. They have also provided specific evidence demonstrating the exceptional quality of their representation which in turn was not reflected in the lodestar fee.

Denying an enhancement to plaintiffs' counsel would thwart the very goal of fee-shifting statutes—vindication of civil rights through effective access to the courts for both poor and wealthy plaintiffs. Plaintiffs' counsel provided a crucial service to the black employees at the GPO. They deserve reasonable compensation for their efforts. Such compensation includes enhancements for both risk of nonpayment and for the quality of their representation.

An appropriate order granting such compensation will be entered.