**Alfred U. McKENZIE et al., Plaintiffs,**

v.

**Thomas F. McCORMICK, Defendant.**

**Civ. A. No. 974–73.**

United States District Court, District of Columbia.

Jan. 12, 1977.

Henry Polmer, Douglas L. Parker, Peter Kolker, Washington, D. C., for plaintiffs.

Paul M. Tschirhart, Ann S. DuRoss, Asst. U. S. Attys., Washington, D. C., for defendant.

MEMORANDUM OPINION

PARKER, District Judge:

Three black employees of the United States Government Printing Office (GPO or Printing Office) on behalf of themselves and black employees similarly situated, charge that they have been wrongfully denied employment opportunities, free of racial bias and discrimination. Specifically, they claim that clearly identifiable patterns of racial discrimination are presently and have long been marked out in the Offset Press Section (OPS) of the Printing Office. They contend that racial discrimination has frustrated and prevented them and other black employees from promotions to which they otherwise are entitled and qualified. In the absence of judicial intervention they claim that these patterns and practices will continue. They seek declaratory and injunctive relief from further discrimination in employment and promotional policies in the Offset Press Section. The named defendant is the Public Printer of the United States, Thomas F. McCormick. Jurisdiction of the Court is based upon Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.,* as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–16.

The parties have filed cross motions for summary judgment. The material facts upon which plaintiffs rely are free of dis-

pute and are based almost entirely upon data secured by discovery from the GPO records as well as official data of the United States Government.[1] They are not challenged by the defendant, but he does contend that the inferences and conclusions which plaintiffs draw from the data are unwarranted and are not compelling.

■ For the reasons set forth, this Court finds that there is a sufficient showing by clear and convincing evidence that blacks in the Offset Press Section are and have been the constant target of racial discrimination and have been wrongfully denied equal opportunities in both employment and promotion. This Court therefore concludes that the plaintiffs' motion for summary judgment should be granted and the defendant's cross motion for summary judgment should be denied.

### Background of the Litigation

This proceeding was filed in 1973 and has since followed an unsteady course. At that time, plaintiffs Alfred U. McKenzie, Willis E. Jones and Alfred L. Ross, Jr. were employed in the Offset Press Section of the Printing Office. McKenzie initially filed a written complaint at the agency level alleging that as an OPS employee he was the victim of racial discrimination and had been denied opportunities for training and advancement. After pursuing procedures at that level he was notified that his complaint had been rejected. He then filed a complaint for relief with this Court which was later amended to include class action allegations on behalf of past, present and future black employees of the Section. The Jones and Ross complaints were filed with the GPO Director of Equal Employment Opportunity, and alleged personal discrimination and discrimination against a class of black employees of the Offset Press Section. Ini-

tially, their complaints were formally accepted but no investigation was ever undertaken. Later the Director of Equal Employment Opportunity, acting on behalf of the GPO, reversed the earlier decision and rejected their complaints. The two were advised of their statutory right to file a civil action and immediately thereafter Jones and Ross filed a class action in this Court. The complaint previously filed by McKenzie was amended to include the later filed class action complaint of Jones and Ross. Thereafter, upon the Government's motion, the proceeding was remanded to the GPO to undertake a review, investigation, and an administrative hearing on the plaintiffs' allegations. Subsequent to the remand, the Government Printing Office also undertook an investigation of a discrimination complaint previously filed by an employees' organization, the Coalition of Minority Workers (CMW). That complaint included allegations similar to those made by the individual plaintiffs. On remand the GPO Director of Equal Employment Opportunity issued findings that did not support plaintiffs' claims of discrimination. The plaintiffs expressed dissatisfaction with the findings and requested a hearing. For a variety of reasons, not important here, the hearing was never scheduled. On the basis of the developed record, motions for summary judgment were filed by the parties.

### Organization of the Offset Press Section

The Offset Press Section is an organizational unit within the Production Department of the Printing Office. That Department encompasses the sections of the GPO which physically produce printed material. It consists of four divisions, including the Offset Division.[2] The Offset Division likewise is divided into four sections: Offset Preparation, Offset Negative, Offset Plate, and the Offset Press Section.

1. The statistics and data are provided by the defendant's responses to plaintiffs' interrogatories, the agency investigative file including the investigative file prepared by the GPO on the complaint of the Coalition of Minority Workers (CMW File), "Study of Minority Group Employment in the Federal Government," published November 30, 1969 by the United States Civil Service Commission and "Minority Group Employment in the Federal Government," published May 1963 by the U.S. Civil Service Commission.

2. The other three divisions are Binding, Composing and Letterpress.

There are three categories of supervisors within the Offset Press Section, including: Foremen (2), Assistant Foremen (5), and Group Chiefs (9). These persons supervise the Offset Pressmen and Printing Plant Workers who actually operate and maintain the offset press equipment. Most of the journeyman pressmen are highly trained individuals who operate the offset press equipment and are referred to generally as "Offset Pressmen." They operate large and complicated presses. Some of the journeyman pressmen occupy "Uprate" positions. These positions include Web Pressmen and Two Color Pressmen and are journeymen who operate more complicated offset press equipment or perform more specialized functions. The Head Pressmen are responsible for the operation of Uprate equipment and supervise other pressmen working on that equipment. Uprate Pressmen are compensated at higher wage rates than that of the regular Offset Pressmen.

Workers generally referred to as "helpers" assist the journeyman pressmen in operating the offset press equipment and perform a variety of duties. Some helpers are selected to participate in training programs, such as the Offset Press Assistant Trainee Program or the Apprenticeship Program. They are designed to train the helpers to eventually become journeyman pressmen. Employees participating in such programs are referred to as "trainees" or "apprentices," rather than "Printing Plant Workers."

### The Class Action Claim

Plaintiffs contend that the data prepared and submitted by the Government Printing Office establish clearly and abundantly that the defendant's employment and promotional policies discriminate against blacks. There is little, if anything, in the record to refute this assertion.

Despite the GPO's contention that race is an insignificant factor in promotion, the fact remains that blacks have been consistently underrepresented in Offset Press Section management positions. Indeed, the number of them so employed suggests that

they may be classified as an endangered species. There were no black supervisors in the Offset Press Section at the date of the filing of this action. Prior to 1973, one black supervisor occupied the position of Group Chief from August 1962 through March 1966. For the period 1971–73, blacks comprised roughly one-half of the employees of the OPS but no black held a supervisory position such as Foreman, Assistant Foreman or Group Chief. In those three years, well over 80% of the Uprate Pressmen were white, whereas the Printing Plant Workers, the lowest ranked employees, were over 90% black.

The disparity in wages between black and white employees in the Offset Press Section shows remarkably similar pattern of discrimination. From 1971 to 1973 the average wage of the white employee rose from $6.71 per hour to $7.84; the average wage of a black increased from $3.84 to $5.05 per hour.

Of the 53 persons in the Section who earned more than the standard journeyman rate of $7.85 during the three year period, over 90% were white whereas of those who earned less than the standard journeyman rate over 90% were black.

As of the date of the filing of this proceeding, there was one black person occupying an Uprate position in the Offset Press Section. The employee had been promoted to that position in 1972. Prior thereto, no black person had assumed any Uprate position. From February 16, 1964, through September 3, 1972, 17 persons were promoted from Offset Pressman positions to Head Pressman positions. All 17 promoted during that period were white. As of September 1973, the average length of tenure for black journeymen in the Offset Press Section of the GPO was 14.8 years, indicating that black journeymen were available for training and for promotion during this time period.

The promotion procedures and policies within the OPS are of major concern. The plaintiffs claim that these practices have been biased, inherently unfair and present an impossible hurdle in securing promotion

and advancement. In addition, they claim that minority interests have not been adequately represented among the decision makers, those who make the ultimate determinations on promotions. Data and references secured from the defendant through discovery support these claims.

Prior to 1972, under the GPO's promotion procedures, job vacancies were not posted anywhere in the agency. Employees generally considered were limited to those who had either applied for a specific vacancy, had completed the Supervisory Development Program, had been nominated by their supervisors, or were already occupying supervisory positions. The crucial decision as to who was promoted was ultimately made by the "appropriate Operating Official." He usually was a person in a management or supervisory position in the employee's section. If there were more than five qualified applicants, a Promotion Panel was utilized. However, the Panel performed no independent function of reviewing the employee's suitability for the position or the validity of the supervisor's evaluation. The supervisory evaluation remained a very important if not the most important factor. Ultimately, a list of candidates was prepared, and they were rated "Best Qualified," "Better Qualified," or "Qualified." This list was returned to the Operating Officials. Those officials also received supervisory evaluations and digest of employment for each of the top five candidates. Using these materials, the appropriate Operating Official would then select the person to be promoted.

In 1972, there was very little change in the promotion practices followed. Notices of individual job openings were published, and an Equal Employment Opportunity representative was added to the Rating Panel. However, the most important factor in rating employees was still the evaluation by the employee's supervisor.

Indeed, the critical factor in promotion determinations is the subjective employee evaluation made by these supervisors. They rate employees who have been declared eligible for promotion by the GPO

Personnel Office. Employees receiving low supervisory evaluations are dropped from further consideration regardless of other qualifications. This crucial evaluation is not based on objective criteria measuring previous job performance, but rather on the basis of whether or not the supervisor "felt" the person being evaluated should be promoted. This practice has of course resulted in the exclusion of blacks from higher paying jobs.

For some time the Printing Office has sponsored a training course, the Supervisory Development Program. The Program is designed to provide a pool of qualified candidates for consideration and selection to supervisory positions. It has been an important factor in the source of selection of persons for promotion in the Offset Press Section. Plaintiffs contend the program has been limited and of little value for blacks and that it has been utilized essentially as a vehicle for qualifying whites for promotion and favoring them over equally competent black personnel. The defendant has admitted that selection of participants in the program is made on the basis of supervisory evaluations, test scores, interviews with an evaluation panel, and finally selection by a management official. Again, a critical factor is that the evaluation procedure relies in large part upon uncertain and illusory standards administered by a white supervisor. The evaluation or rating panel considers aside from the applicant's test scores, experience, and education, such subjective factors as supervisory evaluation and performance during the interview. This, of course, can and has discounted any objectivity that might possibly be associated with other criteria.

A journeyman pressman status is generally achieved in the Offset Press Section by one of three possible routes: Apprenticeship Program, Letterpress Transfer Program and Offset Press Assistant Trainee Program. The Apprenticeship Program was instituted in 1922. In this five-year training program applicants are selected from a Civil Service Commission roster and from the Printing Plant Worker force at

the GPO. The applicant must acquire a passing score on the Civil Service Commission examination and possess an above average work and leave record. The worker at the GPO is selected on the basis of a supervisor's evaluation, his leave records, and Civil Service score. The Letterpress Transfer Program involves a transfer of pressmen working on cylinder presses in the Letterpress Section into the Offset Press Section. After designated training, the transferred worker becomes a full-fledged Offset Pressman. The Offset Press Assistant Trainee Program was inaugurated in 1966. Initially, six persons (four black and two white) completed a period of training and were promoted to become Offset Pressmen in July of 1970. The original program was designed in two phases: first, a minimum of three years of training to reach the position junior offset press assistant; second, two years of training to become an Offset Press assistant and eligible for advancement to Offset Pressman. The second phase of the program was abolished and program trainees eligible for advancement to the second phase instead became eligible for assignment to the GPO Apprenticeship Program as advanced offset pressmen apprentices.

The Apprenticeship Program has failed to provide any appreciable opportunity for blacks to become Offset Pressmen. Until 1968, despite the overwhelming percentages of black employees in the printing plant worker category, apprenticeship classes were predominately white and failed to include a significant number of blacks.

Participation in the Program has not resulted in even a token number of black apprentices becoming Offset Pressmen. From 1968 to 1973, 98 blacks successfully completed the Program but only one was actually assigned to the Offset Press Section. During the same period, 178 white persons graduated from the Apprenticeship Program and 10 were assigned to that Section. During the entire period 1964 through 1971, of the 11 apprentices who attained journeymen status in the Offset Press Section, only one was black.

Blacks also appear to have been totally rejected in the Letterpress Transfer Program. During the period October 1968 through October 1973, 21 persons were transferred from Letterpress to Offset and became journeyman pressmen. None was black.

The Apprenticeship and the Letterpress Transfer Programs have included mostly white workers. On the other hand, the Offset Press Assistant Trainee Program, has historically been mostly black. While it has provided some opportunity for black Printing Plant Workers to become Offset Pressmen, it is subordinate to and has not afforded a supply of journeyman pressmen as under the Apprenticeship and the Letterpress Programs. Moreover, the persons completing the Apprenticeship Program and those transferring from the Letterpress Section have priority for selection for journeyman positions over trainees who have completed the Offset Press Assistant Trainee Program. Therefore, despite the number of black employees participating in the Trainee Program, they do not have an opportunity to become Offset Pressmen equal to that afforded to whites through the Apprenticeship and Letterpress Transfer Programs.

The sum of the statistical evidence presented to this Court shows that there is a lingering policy of racism in the Offset Press Section and that without remarkable exception, the higher ranking, better paying positions in the OPS are held by whites while blacks are clustered around the lower ranking and poorer paying jobs. The evidence also shows that blacks, who constitute more than 50 percent of the employees in that Section, are promoted substantially less frequently than whites.

When racial discrimination is at issue "statistics often tell much, and courts listen." *State of Alabama v. United States*, 304 F.2d 583, 586 (5th Cir. 1962), *affd. per curiam*, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962). As recently noted, "statistical evidence alone—showing a disproportionately low number of black employees—[is] . . . . sufficient to support a finding of

discrimination." *Equal Employment Opp. Com'n v. Detroit Edison Co.*, 515 F.2d 301, 313 (6th Cir. 1975). Such evidence is "particularly appropriate in Title VII class actions where it is the aggregate effect of a[n employer's] . . . policy on the class which is important." *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 259 (3rd Cir. 1975), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

The GPO does not deny the validity of the data but counters and explains that blacks have not been promoted because they fall short of meeting established eligibility requirements including tests and supervisory ratings. Defendant further points out that fair and timely notice of job vacancies is now the rule; that since 1972 blacks have been members of promotional panels; that there is present a black EEO representative; that since 1971 promotional examinations have been closely monitored; that supervisory evaluations appear to be made on the basis of merit rather than race; and, that since 1973 the GPO has had an Affirmative Action Plan. In short, the defendant denies the existence of racial discrimination and argues that the employment picture for blacks in the OPS has significantly improved and that present policies and procedures have resulted in increased promotion and opportunities for promotion. But the data in this regard are limited and clearly do not reflect any remarkable improvement. In view of the record the Court is not convinced that there has been a radical departure from the past within the Offset Press Section and that racial discrimination has been abated to any appreciable degree.

On the basis of the foregoing, this Court concludes that the currently employed black workers of the Offset Press Section of the Government Printing Office, as class plaintiffs, are entitled to appropriate relief. Counsel for the plaintiffs shall prepare and submit a proposed order within 20 days.

The order should give consideration and allowance to any changes ·in the employment pattern and promotional policies affecting black workers during the pendency of this litigation.

### The Individual Claims

■ As to the three named plaintiffs[3] who claim Title VII violations, the record does not lend itself to resolution by summary judgment. The defendant contends that the failure of each plaintiff to be selected for promotion was a combination of factors and generally a lack of supervisory qualifications and potential. This is sharply disputed by the plaintiffs. They claim that while they were qualified for promotion, that nonetheless, they were rejected. They offer affidavits in support of their positions which the defendant disputes. There are material facts at issue and in dispute with respect to the individual claims. They can and should be presented and resolved at a trial *de novo* where the plaintiffs and the defendant may present additional testimony and evidence pertinent to the issues and their respective contentions.

As to the class action claim, summary judgment is granted to the plaintiffs and the defendant's cross motion for summary judgment is denied. As to the individual claims, the motion of the plaintiffs for summary judgment and the cross motion of the defendant for summary judgment are denied.

3. The plaintiff Alfred U. McKenzie resigned from his employment at the Government Printing Office during the pendency of this suit.